UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY SMITH-JOHNSON,

      Plaintiff,                      Civil Action No. 11-14765

            v.                   District Judge MARIANNE O. BATTANI
                                Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

     Plaintiff Kimberly Smith-Johnson brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Doc. #20] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Doc. #15] be DENIED.

## PROCEDURAL HISTORY

On December 5, 2008, Plaintiff applied for DIB and SSI, alleging disability as of January 1, 2008 (Tr. 109, 117). After the initial denial of her claim, Plaintiff requested an administrative hearing, held on July 28, 2010 in Flint, Michigan (Tr. 24). Administrative Law Judge ("ALJ") Andrew Sloss presided. Plaintiff, represented by attorney Lewis Seward, testified, (Tr. 27-41) as did Vocational Expert ("VE") Michele Robb (Tr. 41-44). On November 29, 2010, ALJ Sloss found that although Plaintiff was unable to perform her past relevant work, she was capable of a significant range of other work (Tr. 17-19). On September 28, 2011, the Appeals Council denied review (Tr. 1-4). Plaintiff filed the present action on October 28, 2011.

## BACKGROUND FACTS

Plaintiff, born September 26, 1962, was 48 at the time of the administrative decision (Tr. 19, 109). She graduated from high school and received training as a Certified Nursing Assistant (Tr. 152-153). She worked previously as a packager, home health aide, and in "disability training" (Tr. 148). She alleges that bipolar disorder and headaches render her disabled (Tr. 147).

### A.    Plaintiff's Testimony

Plaintiff testified that she held a current driver's license and was able to drive (Tr. 27-28). She admitted that she had worked since her alleged onset of disability date, noting that she worked between May and September, 2008 as a packager (Tr. 28). Plaintiff stated that the job required her to work more than 40 hours each week (Tr. 28). She stated that she

wanted to work but that her inability to interact appropriately with coworkers and supervisors rendered her disabled (Tr. 29). Plaintiff indicated that she currently took medication for depression and anxiety but that she was unable to continue therapy after losing her medical coverage (Tr. 30). She added that she now experienced right shoulder pain (Tr. 30).

Plaintiff stated that she let her children grocery shop for her since getting into a verbal altercation with a grocery store employee, but was able to meet her grandson's daycare van every day and prepare meals for him (Tr. 31). She stated that she performed light household chores and read "a lot" (Tr. 31).

In response to questioning by her attorney, Plaintiff testified that she was discharged from military service as a teenager for "unsuitable behavior" (Tr. 32). She stated that she was required to take night classes to finish high school due to her perception that her day school classmates disliked her (Tr. 33). Plaintiff stated that she was not asked back to perform the seasonal packaging work in 2009 because she threw something at a coworker she believed was acting inappropriately (Tr. 33). She stated that she did not like being around people, adding that interacting with her son and daughter was sufficient (Tr. 34). She stated that she avoided public transportation and shopping because she felt overwhelmed and paranoid when surrounded by other people (Tr. 34-35). She alleged daily mood swings, noting that her psychotropic medication had recently been adjusted (Tr. 36). She alleged sleep disturbances as a result of both restless leg syndrome and a fear that she would not wake up (Tr. 37). She stated that she required time each day in which she could be alone (Tr. 38). She alleged that her need to eat regular, small meals  as a result of diabetes would

-3-

prevent her from holding a full time job (Tr. 39).  In addition, she stated that her ability to work was impeded by her inability to elevate her right arm for long periods and headaches as a result of hypertension (Tr. 40).

### B.    Medical Evidence

#### 1. Treating Sources

January, 2007 treating notes by Ahmed Arif, M.D. state that Plaintiff experienced choronic bilateral knee pain due to osteoarthritis (Tr. 225).  She was prescribed Darvocet for as needed use (Tr. 225).  Plaintiff denied current back or joint pain (Tr. 224).  In September, 2007, Plaintiff's knee pain as a result of arthritis was described as "mild" (Tr. 218).  The same month, PA Linda Ormond-Matlock opined that Plaintiff did not experience physical work restrictions (Tr. 215).

In December, 2008, Plaintiff sought psychological treatment, reporting that she had experienced depression for the past 10 to 12 years (Tr. 185, 319).  She reported that dealing with her mother and daughter created stress (Tr. 244).  Plaintiff described herself as a "time bomb" at work (Tr. 244).  She stated that she was involved in a long-term romantic relationship and spent her leisure time shopping - either alone or with her daughter and/or grandson (Tr. 245).  She reported that she did not experience problems getting along with either teachers or classmates while in school (Tr. 246).  She reported that currently she did not have any "peer" relationships (Tr. 246).  Plaintiff exhibited average intelligence,

judgment and memory (Tr. 249).  She was assigned a GAF of 50[1] and diagnosed with a bipolar disorder (Tr. 250, 252).  April, 2008 treating notes state that Plaintiff was compliant with treatment and did not experience hallucinations or suicidal or homicidal ideation (Tr. 185).  Her prognosis was deemed good (Tr. 185).  Therapist Laverne McGowan opined that as a result of depression, Plaintiff would have difficulty functioning in a competitive work environment (Tr. 186).   Plaintiff appeared well groomed with good motivation (Tr. 339).

In January, 2009, Plaintiff was discharged from mental health treatment for non-attendance (Tr. 267).   In March, 2009, a "psychosocial" assessment revealed that Plaintiff experienced social anxiety, but was fully oriented and exhibited an appropriate affect (Tr. 366-369).  Plaintiff stated that she had trouble controlling her temper, but while medicated, had "no problems" (Tr. 368).  March and May, 2009 treating notes indicate that Plaintiff reported intermittent knee pain but demonstrated a good range of motion (Tr. 233-234, 342).

In June, 2009, Dr. Gotlib, M.D., noted that Plaintiff did not experience medication side effects (Tr. 360).   A September, 2009 medication review stated that Plaintiff experienced good results from psychotropic medication (Tr. 346).  She was assigned a GAF of 60[2] (Tr. 350).  A December, 2009 assessment states that Plaintiff experienced sleeping

---

[1]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR* )(4th ed.2000).

[2]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision*

problems and disliked going to the mall by herself (Tr. 380).  She demonstrated a logical thought process (Tr. 389).

In January, 2010, Plaintiff reported to a physical treating source that her psychological condition was stable (Tr. 403).  In March, 2010, psychiatrist David Vila, M.D. performed a psychological intake evaluation, finding that as a result of major depression and economic stressors, Plaintiff had a GAF of 40[3] (Tr. 377).   He deemed Plaintiff's intelligence average with poor insight and judgment (Tr. 375).   In May, 2010, Plaintiff reported that she had recently injured her right shoulder (Tr. 399).  Imaging studies of the shoulder taken later the same month were unremarkable (Tr. 407).  In June, 2010, Plaintiff reported that her shoulder condition was "not as bad" as in the previous month (Tr. 420).  The following month, she was described as depressed and "irritable" but fully oriented (Tr. 424).  Dr. Vila assigned her a GAF of 45 (Tr. 431).

### 2.  Non-Treating Sources

 In April, 2008, Plaintiff submitted to a psychological assessment by the Michigan Department of Career Development (Tr. 188-196).  Plaintiff reported that she previously held a janitorial position but quit because she had problems getting to work (Tr. 189).  She reported that she was laid off from her last position as a machine operator for economic

---

(*DSM-IV-TR* )(4th ed.2000).

[3]A GAF score of 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* (*DSM-IV-TR* ) (4th ed.2000).

reasons (Tr. 189).  She indicated that she worked longest as a nurse aide, reporting that she finally quit because "she was becoming too attached to the patients" (Tr. 189).  Plaintiff stated that she had been treated for substance abuse issues after being charged with possession and attempt to deliver cocaine, but that the substance abuse counseling did not address symptoms of depression (Tr. 189).  She stated that she spent her time taking care of her father and grandson, shopping, and traveling (Tr. 190).  Plaintiff expressed a desire to return to her work as a nurse aide (Tr. 190).  Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") testing showed a full scale IQ of 76 (borderline functioning) (Tr. 190).  However, her non-verbal and memory skills were deemed "low average" and processing speeds, average (Tr. 191-192).  She was assigned a GAF of 55[4] (Tr. 193).  Psychologist Mary P. Koopman advised against seeking work involving "children, elderly or the ill," but found that Plaintiff could work as a receptionist, secretary, legal assistant, or medical biller, provided that she stabilize her psychological symptoms before obtaining employment (Tr. 195).

In April, 2009, Samiuliah H. Sayyid, M.D. performed a physical examination of Plaintiff on behalf of the SSA (Tr. 300-303).  Plaintiff demonstrated left knee tenderness but no inflammation or crepitus (Tr. 302).  Her posture and ambulation were deemed unremarkable (Tr. 303).  The same month, Joyce Cowan completed a non-examining

---

[4]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ), 30 (4th ed.2000).

Physical Residual Functional Capacity on behalf of the SSA, finding that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently; sitting, standing, or walking for six hours in an eight-hour workday; and pulling pushing in the upper extremities without limitation (Tr. 305). Plaintiff's ability to push/pull in the lower extremities was deemed limited by knee problems (Tr. 305). The postural limitations consisted of occasional climbing, kneeling, crouching, and crawling, and frequent (as opposed to *constant*) balancing and stooping (Tr. 306). Cowan found the absence of manipulative, visual, communicative, or environmental limitations (Tr. 307-308). Cowan found Plaintiff's allegations of limitations "less than fully credible," remarking that the medical evidence did not support claims of shoulder or manipulative problems (Tr. 309).

The same month, Rom Kriauciunas performed a non-examining Psychiatric Review Technique, finding the presence of major depression and mental retardation (Tr. 271-272). Restrictions in social functioning and concentration, persistence, or pace were deemed moderate and limitations in activities of daily living, mild (Tr. 278). Dr. Kriauciunas noted the absence of episodes of decompensation (Tr. 278). He concluded that Plaintiff was able to perform "unskilled work" and "simple tasks on a sustained basis" (Tr. 280). Dr. Kriauciunas also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention for extended periods; interact appropriately with the general public; or react appropriately to workplace changes (Tr. 282-283).

### C.  Vocational Expert Testimony

VE Michele Robb classified Plaintiff's former work as a home health aide, packager, and chore provider as exertionally medium and unskilled[5] (Tr. 180).   The ALJ then posed the following hypothetical question to the VE, taking into account Plaintiff's age, education, and work experience:

> [S]he is limited to occasional foot control operation with her left lower extremity.  She can only occasionally climb, crouch, kneel, or crawl.  And can frequently balance or stoop.  She is limited to occasional overhead reaching with her right upper extremity.  She has non-exertional limitations in that she is limited to simple, routine, and rep[e]titive tasks and must avoid contact with the general public.  Could such a person perform any of the claimant's past work? (Tr. 42).

In response, the VE found that although the hypothetical individual would be unable to perform any of Plaintiff's former jobs, she could perform the unskilled, exertionally light work of a general office clerk (5,000 jobs in the regional economy); machine operator (12,300); and inspector (4,100) (Tr. 43).  The VE stated that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 43).

In response to questioning by Plaintiff's attorney, the VE stated that if the individual was unable to perform any reaching in the upper right extremity, she could not perform any

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

of the above-stated jobs (Tr. 43-44).  The VE stated further that the above-stated jobs would not permit more than two absences a month due to depression (Tr. 244-245).  She closed her testimony by stating that the need to take unscheduled breaks over the course of the workday would also preclude the above jobs (Tr. 44).

###   D.      The ALJ's Decision

Citing the administrative transcript, the ALJ found that Plaintiff experienced the severe impairments of "[m]ajor depression, degenerative joint disease of the right shoulder and arthritis of the left knee" but that neither condition met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr.12-13).  The ALJ found that Plaintiff retained the   residual functional capacity ("RFC") for unskilled, light work with the following additional restrictions:

> [S]he is limited to occasional foot control operation with her left lower extremity.  She can only occasionally climb, crouch, kneel or crawl, and can frequently balance or stoop.  She is limited to occasional overhead reaching with the right upper extremity.  She can perform simple, routine, repetitive tasks, but must avoid contact with the general public (Tr. 14).

Citing the VE's testimony, the ALJ found that although Plaintiff was unable to perform any of her former work, she could perform the work of a general office clerk, machine operator, and inspector (Tr. 17-18).

The ALJ discounted Plaintiff's allegations of disability as a result of psychological problems, citing April, 2008 findings that she was capable of working in jobs that did not involve children, the elderly or the ill (Tr. 15).  The ALJ noted that Plaintiff's psychological condition had not required "hospitalization or crisis intervention" (Tr. 15).  He cited June,

-10-

2009 treating notes stating that Plaintiff responded positively to antidepressive medication (Tr. 16).

In regard to physical limitations, the ALJ supported his inclusion of right arm and lower extremity limitations by citing Dr. Sayyid's consultive examination findings (Tr. 16). However, he also noted that although Plaintiff reported right shoulder pain to Dr. Salim, imaging studies of the shoulder were unremarkable (Tr. 17).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*,

-11-

884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The ALJ's Step Three Analysis

Plaintiff argues first that the ALJ erred by failing to consider whether "mental retardation" ought to have resulted in a disability finding at Step Three of the sequential analysis. *Plaintiff's Brief* at 3-6. She contends that the April, 2008 WAIS-III testing revealing a verbal IQ of 69 (Tr. 190) and Dr. Kriauciunas' April, 2009 finding of mental

retardation (Tr. 272), at a minimum, obliged the ALJ to articulate why Plaintiff was not disabled under Listing 20 C.F.R. Pt. 404 Subpt. P, App. 1, 12.05(C)(mental retardation). *Id.*

 Plaintiff bases this argument on one of the four possible criteria for disability as a result of mental retardation under Listing 12.05 which requires a showing of "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 CFR Pt. 404, Subpt. P, App. 1, 12.05(C).

The contention that the ALJ erred by omitting mention of mental retardation at Step Three is not well taken.  First, although Dr. Kriauciunas' found the presence of mental retardation, he specifically found that Plaintiff was not disabled by the condition (Tr. 272). Second, Koopman's examining evaluation (on which Dr. Kriauciunas based his non-examining findings) did not state that Plaintiff was mentally retarded, noting instead that although Plaintiff had a verbal IQ of 69, she had a full scale IQ of 76 with "low average" non-verbal and memory skills and average processing speeds (Tr. 191-193). Koopman found that reading difficulties, rather than borderline intelligence, explained the discrepancy between the low verbal IQ and higher scores on other testing (Tr. 192-193). Although Dr. Kriauciunas' finding was purportedly based on Koopman's earlier findings, Koopman's interpretation of the test results cannot be reasonably interpreted to conclude that Plaintiff was mentally retarded, much less that the condition was disabling.  Notably, Koopman concluded that Plaintiff's intellectual limitations did not prevent her from working as a

-13-

receptionist, secretary, legal assistant, or medical biller (Tr. 195).   Koopman's finding are

also supported by treating source observations that Plaintiff displayed "average" intelligence

(Tr. 249, 375).

Plaintiff also appears to argue that because the ALJ adopted Dr. Kriaucinunas' "'B'

Criteria" findings of moderate limitations in social and concentrational functioning, the ALJ

also adopted the "mental retardation" finding and was thus obliged to provide a full blown

analysis of why Plaintiff did not meet Listing 12.05(C).  *Plaintiff's Brief* at 3-4.  She cites

*Reynolds v. Commissioner of Social Security,* 424 Fed.Appx. 411, 416, 2011 WL 1228165,

*4 (6th Cir. April 1, 2011) a recent unpublished Sixth Circuit case in which a remand was

granted on the basis that "[n]o analysis whatsoever was done as to whether Reynolds'

physical impairments . . . met or equaled a Listing" at Step Three of the ALJ's analysis.  *Id.*

at 415, *3.    *Reynolds,* in which the ALJ made a Step Two finding that back pain was a

severe impairment, is distinguishable from the present case.  There, the ALJ failed to follow

through on his Step Two finding by explaining at Step Three why the severe impairment of

back pain did not meet or equal a listed impairment.    *Id.*  In contrast here, the ALJ did not

find that mental retardation was a severe impairment at Step Two.  Requiring the ALJ to

perform a Step Three analysis of every finding in the transcript (even a single, non-

examining finding based on a questionable interpretation of examining source material) is

not required by either the Social Security Regulations or case law.  *See Kornecky v.*

*Commissioner of Social Security,* 167 Fed.Appx. 496, 2006 WL 305648, *8-9 (6th Cir.

-14-

February 9, 2006)(*citing Loral Defense Systems-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999))("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each . . . opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party").

Finally, Plaintiff also notes in a somewhat contradictory fashion that the ALJ "did not contest" Koopman's finding of a reading disorder. *Plaintiff's Brief* at 4 (citing Tr. 15). However, Koopman's findings that the verbal IQ of 69 was attributable to reading difficulty, *rather* than mental retardation further undermines the argument that the condition of mental retardation ought to have been discussed at Step Three (Tr. 192-193) . As such, the ALJ did not err in declining to discuss Listing 12.05(C) at Step Three of his analysis.

### B. The Hypothetical Question

For overlapping reasons, I disagree with Plaintiff's contention that the hypothetical question limiting her to unskilled work, and avoidance of "contact with the general public" was insufficient to fully account for her moderate deficiencies in concentration, persistence, or pace ("CPP"). *Plaintiff's Brief* at 6-8 (citing Tr. 42).

To be sure, Plaintiff is correct that moderate deficiencies in CPP suggest substantial limitations which must be acknowledged in the hypothetical question. *Edwards v. Barnhart,* 383 F.Supp.2d 920, 931 (E.D.Mich.2005) (Friedman, J.). The failure to account for

moderate deficiencies in CPP in the hypothetical question constitutes reversible error. "[U]nskilled work," or "simple work" may be insufficient to account for moderate deficiencies in CPP. *Id.* However, *Edwards* cannot be read to hold that the terms "simple, routine, unskilled work" are *always* insufficient to describe such limitations. Instead, *Edwards* states that these terms "[w]hile close," did not "fully convey" the claimant's concentrational problems. *Id,* at 930. Further, other courts in the district have found the terms simple, routine, and unskilled sufficient to account for the claimant's moderate concentrational limitations. *See Lewicki v. Commissioner of Social Security*, 2010 WL 3905375, *2 (E.D. Mich. Sept. 30, 2010)(the modifiers of "simple routine work" adequately accounted for the claimant's moderate deficiencies in CPP); *see also Schalk v. Commissioner of Social Sec.*, 2011 WL 4406824, *11 (E.D.Mich. August 30, 2011)("no bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations)(citing *Hess v. Comm'r of Soc. Sec.,* No. 07–13138, 2008 WL 2478325, *7 (E.D.Mich. June 16, 2008)).

Plaintiff's reliance on *Ealy v. Commissioner,* 594 F.3d 504 (6th Cir. 2010) in support of this argument is also unavailing. *Ealy* does not hold that the terms "simple, repetitive," or similar descriptives are intrinsically inadequate to address moderate CPP deficiencies. Rather, the *Ealy* Court determined that the hypothetical limitations of "simple, repetitive"(drawn from a non-examining medical source) impermissibly truncated the source's conclusion that the claimant should be limited to "simple repetitive tasks to '[two-

hour] segments over an eight-hour day where speed was not critical.'" *Id.,* 594 F.3d at 516. The position that "simple and repetitive" or synonymous terms are *always* insufficient to address moderate CPP deficiencies (even where the record does not support more stringent limitations) reflects an erroneous reading of *Ealy.*

In contrast here, the ALJ actually amended Krianciunas' finding that Plaintiff could perform "unskilled work" and "simple tasks on a sustained basis" (Tr. 280) by limiting her to unskilled work involving only simple, routine, and repetitive tasks (Tr. 42).   I also disagree with the argument that the ALJ was obliged to include all of Krianciunas' discrete findings from the Mental Residual Functional Capacity Assessment in the question to the VE.   While Plaintiff asserts that the moderate limitations in the ability to understand, remember, and carry out detailed instructions ought to have been included in the question posed to the VE (Tr. 282), the ALJ was not required to include every finding of the two-page assessment in the hypothetical question.  While "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments," it need not contain a laundry list of all of her particularized conditions.  *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir.2004)(citing *Varley v. Commissioner of Social Sec.,* 820 F.2d 777, 779 (6th Cir. 1987)); *See also Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001).  Moreover, by itself, the ALJ's restriction to unskilled work, by itself, would preclude work involving detailed instructions.     Moreover, substantial evidence supports the conclusion that more restrictive hypothetical limitations were not required.  Treating

notes state that Plaintiff exhibited average intelligence, judgment and memory with a good prognosis (Tr. 185, 249).  Admittedly,  therapist Laverne McGowan opined in April, 2008 that Plaintiff's psychological problems would create difficulty maintaining competitive employment (Tr. 186).  However,  March and September, 2009 treating notes state that Plaintiff achieved good results from psychotropic medication and had "no problems" when properly medicated (Tr. 346, 368). More generally, evidence showing that Plaintiff engaged in a wide range of activities, including travel, sustaining a long-term romantic relationship, and caring for her grandson also undermine her allegations of disability due to social and concentrational problems.

In closing, I note that the transcript supports the finding that Plaintiff experienced some degree of limitation.  As such, my decision to uphold the ALJ's findings should not be read to trivialize her documented limitations.  Nonetheless, the ALJ's determination that the Plaintiff was capable of a range of unskilled, light work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

**CONCLUSION**

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Doc. #20] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Doc. #15] be DENIED.

-18-

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: December 14, 2012

-19-

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on December 14, 2012.

Johnetta M. Curry-Williams
Case Manager